# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>BARRIE J. OSBORNE<br><br>*Defendant(s)* | )<br>)<br>) Case No. 21-mj-1699<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  January 1, 2019 to Aug. 16, 2021  in the county of   Philadelphia   in the
  Eastern   District of   Pennsylvania  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud |

This criminal complaint is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

/s/ Josh Mitnick
*Complainant's signature*

JOSH MITNICK Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/06/2021 11:22 a.m.

Carol Sandra Moore Wells
2021.11.06 15:50:20 -04'00'
*Judge's signature*

City and state:   Philadelphia, PA  

Honorable Carol S. Moore Wells
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant (approved by AUSA)

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| BARRIE J. OSBORNE | ) | Case No. 21-mj-1699 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:   Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* _____ ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☑ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:
Between January 1, 2019 and August 16, 2021, BARRIE J. OSBORNE conspired to commit wire fraud, all in violation of 18 U.S.C. § 1349.

Date: 11/06/2021 11:22 am

Carol Sandra Moore Wells
Carol Sandra Moore Wells
2021.11.06 15:51:01 -04'00'

*Issuing officer's signature*

City and state:   Philadelphia, PA

Honorable Carol S. Moore Wells
*Printed name and title*

| Return | |
|---|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . | |
| Date: _____ | _____ *Arresting officer's signature* |
| | _____ *Printed name and title* |

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joshua Mitnick, Special Agent, being duly sworn, hereby affirm the following facts as being true to the best of my knowledge, information, and belief:

1. I have been a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations since February 2008. Prior to my employment as a Special Agent with HSI, I was a Canine Enforcement Officer with the Department of the Treasury, United States Customs Service for approximately five years. My primary investigative assignment has been the investigation of immigration and customs related matters. I have been involved in cases involving financial fraud, including wire fraud, and conspiracies to commit the same either as a participating investigator or as a case agent. I have received Customs Inspector Training, Canine Enforcement Training, Criminal Investigator Training, and ICE Special Agent Training, as well as specific training on financial fraud and money laundering.

## INTRODUCTION AND AGENT BACKGROUND

2. The information presented in this affidavit comes from my personal observations, my training and experience, my review of reports, documents, and evidence, including evidence obtained through judicially authorized search warrants, and information obtained from other law enforcement agents, witnesses, and agencies, including, but not limited to the Federal Bureau of Investigation, the Internal Revenue Service – Criminal Investigation, and the Small Business Administration – Office of Inspector General. The facts set forth do not constitute all that has

1

been learned during the investigation but only enough to establish probable cause. Unless otherwise noted, all dates and amounts are approximate.[1]

3. I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7).

4. I make this affidavit in support of a criminal complaint charging BARRIE J. OSBORNE with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, from on or about January 1, 2019 to at least on or about August 16, 2021 in the Eastern District of Pennsylvania and elsewhere (the "Target Offenses").

5. I also make this affidavit in support of an application for an arrest warrant to arrest OSBORNE. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. At all times relevant to this Complaint, OSBORNE and/or other named or unnamed co-conspirators, either submitted and/or caused to be submitted false documentation in support of various loan programs, including the Paycheck Protection Program ("PPP"). In certain of the PPP applications described below, false documentation was sent via the Internet from one of the co-conspirators' residences located in California to various financial institutions, the Small Business Administration ("SBA"), and other service providers.

---

[1] The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District. As a result, not all individuals and entities are described herein. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

2

6. In connection with at least one of the fraudulent loan applications submitted by OSBORNE, Co-conspirator 1 ("CC-1"), Co-conspirator 2 ("CC-2"), Co-conspirator 3 ("CC-3") and/or other co-conspirators, funds were routed via interstate wire from its origin to its destination through the Eastern District of Pennsylvania.

7. Moreover, as noted in greater detail below, in furtherance of the scheme, OSBORNE also electronically submitted and filed business and personal tax returns on behalf of himself and other co-conspirators with the Internal Revenue Service ("IRS") from his home in Florida; and OSBORNE received a tax refund from the IRS Service Center located in the Eastern District of Pennsylvania.

## The Conspirators

8. BARRIE J. OSBORNE was a resident of Celebration, Florida. OSBORNE was a certified public accountant and owner of a tax preparation company called Guardian Angel Associates, LLC ("Guardian Angel").

9. CC-1 was a resident of Chatsworth, California. CC-1 was the purported owner of a California-based consulting company called Authora LLC. Authora LLC was first registered with the State of New Mexico on or around March 10, 2015. On or around June 3, 2019, CC-1 registered Authora LLC with the Secretary of State for the State of California. During the course of the conspiracy, as described below, CC-1 submitted, or had caused to be submitted on his behalf, materially false loan applications for Authora LLC and filed fraudulent tax returns in support of the applications.

10. CC-2 was a resident of Simi Valley, California. CC-2 purportedly owned or effectively controlled various companies involved in the scheme.

11. CC-3 was a resident of Azusa, California. CC-3 was the purported owner of another company involved in the scheme.

## The Small Business Administration

12. The SBA was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### *SBA Loan Programs*

13. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

### *The PPP*

14. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding. In or around December 2020, Congress expanded and extended the PPP to March 31, 2021, and authorized over $280 billion for additional initial PPP loans for first-time PPP borrowers, as well as second PPP loans ("PPP Second Draw") for smaller and harder

4

hit businesses. On or about March 30, 2021, and as a result of ongoing economic challenges faced by small businesses, Congress again extended the PPP to May 31, 2021.

15. In order to obtain an initial PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation (generally, a business tax return) to substantiate their payroll expenses.

16. PPP loan applications were processed by a participating financial institution (the lender). If a PPP loan application was approved, the lender funded the PPP loan using its own monies, which are 100 percent guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

17. As part of the PPP, businesses were required to use PPP loan proceeds on certain permissible expenses, including, among others, payroll costs, interest on mortgages, rent, or utilities. Additionally, Congress provided for loan forgiveness on the interest and principal of the PPP loan if the business spent the loan proceeds on these expense items within a designated period

of time (within eight weeks of receiving the proceeds) and used at least 75% of the PPP loan proceeds on payroll expenses.[2]

*The EIDL Program*

18. Another source of relief provided by the CARES Act was the expansion of the SBA's Economic Injury Disaster Loan ("EIDL") program, which was created before the COVID-19 pandemic and was expanded to address small business owners' needs during the pandemic. Specifically, the CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing financial disruption due to the COVID-19 pandemic. The CARES Act also authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL ("EIDL Advance"). The amount of the EIDL Advance was determined by the applicant's number of employees, which the applicant had to certify. The EIDL Advances do not have to be repaid.

19. In order to obtain an EIDL and EIDL Advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. The applicant must also certify that the information in the application is true and correct to the best of the applicant's knowledge.

*The SBA's 7(a) Loan Program*

---

[2] In or around June 5, 2020, Congress expanded the PPP by: (a) lowering to 60% the requirement that 75% of loan proceeds be spent on payroll costs in order to be eligible for loan forgiveness; and (b) extending the length of time borrowers have to spend the proceeds from eight to 24 weeks. In or around December 2020, Congress further expanded the PPP by broadening the permissible, forgivable expenses available to borrowers whose loans had not yet been forgiven as of December 21, 2020, including worker protection costs related to COVID-19, uninsured property damage costs by looting or vandalism during 2020, and certain supplier costs and expenses for operations.

20. The SBA's pre-pandemic loan program designed to assist small businesses and offered pursuant to Section 7(a) of the Small Business Act of 1953 ("7(a) Loan") was designed to provide loans to small businesses that might not otherwise obtain financing on reasonable terms and conditions. In order to obtain a 7(a) Loan, a qualifying business was required to submit a 7(a) Loan application signed by an authorized representative of the business. The 7(a) Loan application required the small business to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the 7(a) Loan and to determine the amount of the loan, including: (i) information about the number of employees, as well as "total average annual receipts" for the business's latest three complete fiscal years (which are normally found on IRS tax return forms); (ii) a demonstrated need for the loan proceeds; (iii) planned use of the funds for a sound business purpose; and (iv) absence of delinquency on any debt obligations to the U.S. government.

## PROBABLE CAUSE

### Summary

21. As described in greater detail below, there is probable cause to believe that OSBORNE and other known and unknown co-conspirators, participated in a conspiracy to obtain by fraud loans through the PPP, EIDL, and SBA 7(a) loan programs by, among other means, defrauding multiple federally insured financial institutions, including, but not limited to, a federally insured financial institution located in the Eastern District of Pennsylvania. To obtain the loans, OSBORNE and his co-conspirators submitted false loan applications for dormant, shelf, or non-existent businesses, most of which were not functioning entities or legitimate companies.

7

22. As part of the scheme, OSBORNE and co-conspirators created and used fraudulent documentation, including, but not limited to, false tax returns, doctored bank statements, and fake customer invoices. On these loan applications, OSBORNE and his co-conspirators also falsified material information, including the number of employees for a given business, payroll expenditures, and other documentation, and made a variety of false representations, including that certain businesses were operational and in existence as of February 2020, as required under the PPP.

### Relevant Lending Institutions and Other Financial Institutions

23. Bank 1 was a federally insured financial institution based in Florida.

24. Bank 2 was a federally insured financial institution based in Minnesota.

25. Bank 3 was a federally insured financial institution based in New Jersey.

26. Bank 4 was a federally insured financial institution based in the Eastern District of Pennsylvania.

27. Banks 1, 2, 3, and 4 were authorized by the SBA to participate as lenders to small businesses.

28. Company 1 was a lender based in California. Company 1 participated in the SBA's 7(a) program.

29. Company 2 was a financial technology company based in California. Company 2 participated in the SBA's PPP by, among other things, acting as a service provider between small businesses and certain lenders. Small businesses seeking a PPP loan could apply through these companies, which would review the PPP loan applications. If a PPP loan application received by

8

one of these companies was approved for funding, a partner lender, such as Bank 3, disbursed the loan funds to the applicant.

## OVERVIEW OF THE CONSPIRACY AND THE SCHEME TO DEFRAUD

30. A review of e-mail communications and loan applications shows that, as part of the conspiracy, OSBORNE submitted, and caused to be submitted, at least six false and fraudulent loan applications in the name of several companies, including Authora LLC, to various banks, companies, and the SBA seeking over $1.4 million in fraudulent proceeds. Some of the loan applications were approved and the loans were subsequently funded, as further described below. Ultimately, throughout the conspiracy, OSBORNE and others helped CC-1 obtain at least approximately $591,540 in fraudulent proceeds. The following loans were applied for on behalf of Authora LLC in the amounts specified from on or about July 1, 2019, to June 16, 2020.

| Lender / Company | Business Owner | Loan Program | Approximate Loan Amount | Funded |
|---|---|---|---|---|
| Bank 1 | CC-1 | 7(a) | $350,000 | No |
| Bank 2 | CC-1 | 7(a) | $250,000 | No |
| Bank 3 / Company 2 | CC-1 | PPP (1st round) | $467,640 | Yes |
| Company 1 | CC-1 | 7(a) | $250,000 | No |
| SBA | CC-1 | EIDL | $123,900 | Yes |

9

## PURPOSE OF THE CONSPIRACY

31.　It was the purpose of the conspiracy for OSBORNE to defraud multiple banks, including at least one bank located in the Eastern District of Pennsylvania, companies, and the SBA, and unjustly enrich himself and others by fraudulently obtaining small business loans under false and misleading pretenses.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME

32.　Beginning in or about January 1, 2019, through at least in or around August 16, 2021, OSBORNE and others engaged in a scheme to defraud multiple banks, companies, and the SBA and illegally obtain loans for several companies, including companies associated with CC-1, CC-2, CC-3, and others.

33.　On or about August 17, 2021, OSBORNE made the following statements, among others, to law enforcement during a voluntary interview:

　　a. In or around early 2020, CC-1 contacted OSBORNE and told OSBORNE that he believed there was an opportunity for CC-1's California-based co-conspirators to receive PPP loans. OSBORNE agreed to assist CC-1.

　　b. CC-1 would contact OSBORNE, send data and tax information on behalf of CC-1 and other co-conspirators to OSBORNE and OSBORNE would prepare the tax and other documents and send them back to CC-1

10

    c. OSBORNE knew the numbers on the tax and other documents were not accurate, including with respect to at least three co-conspirator companies—Boostmore LLC, Minnow LLC, and Trans Logistics LLC—since OSBORNE prepared and submitted to the IRS actual tax returns on behalf of a number of the co-conspirators, including the purported owners of Boostmore LLC, Minnow LLC, and Trans Logistics LLC.

    d. OSBORNE was aware that the tax and other documents he was creating were being used in support of the loan applications.

    e. OSBORNE was aware that his actions were illegal.

    f. The PPP applications that OSBORNE submitted on behalf of his own companies, were "total bullshit." OSBORNE identified these companies as Guardian Angel Associates LLC and Barrie Osborne (sole proprietorship).

34.    Furthermore, a review of email communications, loan applications and bank statements shows that the PPP applications for Boostmore LLC, Trans Logistics LLC, and Minnow LLC were submitted to lenders, including Bank 4, which was located in the Eastern District of Pennsylvania. The Boostmore LLC and Trans Logistics LLC applications were funded by Bank 4.

### Fraudulent SBA 7(a) Loan Applications

35.    A review of e-mail communications and loan applications, including documents obtained directly from OSBORNE shows the following. As part of the conspiracy to obtain loans for Authora LLC and other "shelf" corporations, OSBORNE and others knowingly submitted, and caused to be submitted, materially false loan applications and fraudulent

11

documentation to lenders, companies, and the SBA that purported to show legitimate business operations, expenses, and employees. To carry out the scheme, OSBORNE and others created and submitted fraudulent tax returns with the loan applications and, in support of the scheme, also filed certain of these false tax returns with the IRS. After the loan proceeds were received by the applicants, OSBORNE instructed them on how to conceal the illegal proceeds of the fraud and to wire money to another entity associated with CC-2 so that it appeared as though the payments were legitimate payroll expenses, which would generally be forgivable under the PPP.

36. On numerous occasions during the course of and in furtherance of the conspiracy, OSBORNE and others created fraudulent documents to make it appear as though Authora LLC and other shelf corporations were active and legitimate companies when, in fact, they had no actual business operations, activity, or employees. For example, a review of e-mail communications and loan applications submitted on behalf of Authora, shows that CC-1 claimed over $80,000 in income from Authora for 2019. However, as e-mail communications and financial records show, Authora LLC had no actual business operations in 2019.

37. A review of e-mail communications related to 7(a) loan applications, bank records, and other financial records further shows that, as part of the 7(a) loan portion of the scheme, OSBORNE would charge his co-conspirators fees for his work to create fraudulent tax returns. These fraudulent tax returns were in turn used to create the façade that shelf companies, including Authora LLC, were well-established and functioning businesses. As e-mail communications show, Authora LLC was not actually a functioning business with operations, activity, or employees.

12

38. A review of e-mail communications shows that, throughout the conspiracy, OSBORNE would communicate regularly with the co-conspirators and send fraudulent tax returns and other documentation as needed for the fraudulent loan applications. If needed, OSBORNE would also provide co-conspirators with additional fraudulent information or documents to be submitted to the lenders.

39. A review of e-mail communications shows that, as part of this work to assist co-conspirators applying for 7(a) loans, OSBORNE would create scripts that co-conspirators would use during calls with lenders. The scripts included fabricated figures about the business's purported operations, location, and ownership, a made-up description of the business, and a fictious overview of its financial picture. The scripts contained fraudulent information about the various companies that co-conspirators used during telephone discussions with bank officers as part of the application process. For example, a review of e-mail communications shows that OSBORNE created a script for CC-1 and others to use when speaking with lenders for applications submitted by Authora LLC. A review of state incorporation documents, e-mail communications, and financial records shows that the script falsely claimed, among other things, that CC-1 had owned and operated Authora LLC since 2015 when, in reality, CC-1 became associated with Authora LLC in or around June 2019, in order to apply for a 7(a) loan.

40. A review of e-mail communications, loan applications, and financial records, shows that, as part of the conspiracy to obtain 7(a) loans, OSBORNE and his co-conspirators worked together to file fraudulent corporate and individual tax returns and create income statements and balance sheets that purportedly showed business income, operations, and expenses. These documents, which contained fraudulent representations, were submitted to

13

Bank 1, Bank 2, and Company 2 to give the appearance that Authora LLC was a legitimate and functioning entity applying for a small business loan.

41. A review of e-mail communications and financial records shows that, on or about June 24, 2019, OSBORNE also sent, or caused to be sent, wires containing fraudulent personal tax returns for CC-1 to the IRS in case lenders requested official copies of the same from the IRS to confirm business income claimed on the loan application. Additionally, a review of e-mail communications and financial records shows that OSBORNE sent, or caused to be sent, wires containing fraudulent personal tax returns to the IRS; and a review of bank records shows that OSBORNE personally received a tax refund from the IRS Service Center in Philadelphia.

### Fraudulent PPP Applications

42. In support of the fraudulent PPP applications, OSBORNE and co-conspirators submitted, and caused to be submitted, false and fraudulent documentation on behalf of Authora LLC that purported to substantiate the monthly payroll expenses, assets, and employees. A review of e-mail communications and loan applications shows that this supporting documentation included false and fraudulent financial documents, in which the purported payroll expenses and the number of employees were fabricated. For example, a review of e-mail communications and PPP loan applications submitted on behalf of Authora, shows that the Authora applications claimed 12 employees and average monthly payroll of $187,056 for 2019. However, as e-mail communications and bank records show, no payroll expenses were made from the bank account for Authora LLC, and instead it was used to send payments to others in the conspiracy to give the appearance of legitimate payroll expenditures that would be necessary to demonstrate in order to obtain forgiveness of the loan.

43. A review of e-mail communications shows the following. As part of the PPP scheme, OSBORNE prepared fraudulent tax returns and application materials that CC-3 then forwarded to CC-1 and others with instructions on how to complete the forms before submitting them to the bank. After receiving the fraudulent PPP loan package from the conspirators, CC-1 reviewed, signed, and returned the fabricated tax returns and applications to others in the conspiracy who in turn provided those false tax returns and applications to the lenders.

44. A review of e-mail communications and loan applications shows that, on or about May 6, 2020, a first round PPP loan application for Authora LLC that contained fake tax documents was submitted to Bank 3 and Company 2 on CC-1's behalf. After reviewing the fraudulent application and relying on the false material presented on the tax document, among other things, Bank 3 funded the loan for approximately $467,640. As a review of e-mail communications and financial records show, the PPP loan application fraudulently represented that Authora LLC had 12 employees, when in fact the company had no employees.

Respectfully submitted,

*/s/ Joshua A. Mitnick*
JOSHUA A. MITNICK, Special Agent
U.S. Dept. of Homeland Security,
Homeland Security Investigations

Carol Sandra Moore Wells
2021.11.06 15:52:49 -04'00'

_____
CAROL SANDRA MOORE WELLS
United States Magistrate Judge

15